

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AHT:TRP
F. #2012R01923

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 9, 2015

By ECF

The Honorable Sterling Johnson, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Chaim Lebovits
                Criminal Docket No. 11-134 (SJ)

Dear Judge Johnson:

      The government respectfully submits this letter in connection with the defendant's sentencing, which is scheduled for April 13, 2015. While the Presentence Investigation Report ("PSR") indicates that the Guidelines range of imprisonment applicable to the defendant is 41 to 51 months, the government respectfully argues that, in accordance with the plea agreement entered into by the parties, the Court should find the applicable Guidelines range to be 12 to 18 months. Further, pursuant to the plea agreement entered into by the parties, the government recommends that the defendant be sentenced to a term of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B).

**I.**       **Background**

      The charges against the defendant arose from his involvement in a scheme to fraudulently induce insurance companies to issue policies with high death benefits to elderly insureds and later sell those policies for a profit, which occurred on or about and between January 2007 and May 2010. See Pre-Sentence Investigation Report ("PSR") ¶ 11. Many of the fraudulent policies were submitted through Liberty Planning, Inc., an insurance agency located in Monsey, New York, of which the defendant was the Vice-President and Managing General Agent. PSR ¶ 4. The defendant had authority to disburse funds from Liberty Planning's bank accounts, as well as the bank accounts of several other related entities which he controlled, including CSL Properties, LLC; CSL Properties II, LLC; CSL Properties III, LLC; and the Rocklyn Group, Ltd. (collectively, "the Lebovits Related Companies"). Id.

      Insurance companies do not ordinarily sell policies where the benefits payable upon the death of the insured are in excess of the amount needed to serve the specified

purpose of the policy. PSR ¶ 9. Under New York State law, only the insured, a close family relative or an individual with an insurable interest can purchase life insurance policy on an insured's life. PSR ¶ 14. In furtherance of the instant conspiracy, applications were submitted to insurance companies through Liberty Planning and other agencies which contained false statements that not only induced those companies to issue the policies but also to charge lower premiums than would otherwise apply. PSR ¶ 12. The false statements on the insurance applications included (1) the insureds had large net worths and annual incomes, above their true net worths and incomes; (2) the insureds did not intend to resell the policies on the secondary market for life insurance; (3) the insureds intended to pay the premiums themselves with their own money; (4) the insureds had not been compensated or promised compensation for applying for the policies; (5) the insureds did not obtain, and would not hold the policies for others who were investing in the insureds' life; and (6) the purpose of the insurance policies was "estate planning," "estate liquidity," "estate conservation" or some equivalent description. Id. However, each of these statements was false. To incentivize the elderly insureds to go along with the scheme, the conspirators paid cash and promised other financial incentives to them in exchange for the insureds submitting false applications. PSR ¶ 12.

Co-conspirators Moses Neuman, Yudah Neuman and Leo Fekete recruited elderly "straw insureds" who applied for life insurance primarily through Liberty Planning via insurance applications in which their net worths and incomes were inflated. PSR ¶ 32. The Neumans also recruited and compensated Edward Grodsky, an accountant, who participated in the scheme by recruiting elderly straw insureds and assisting them in the application process by purporting to verify their inflated net worth and income information. PSR ¶¶ 32 and 36. Many of the policies listed Avigdor Gutwein, a life insurance agent affiliated with Liberty Planning, as the insurance agent. Gutwein knowingly submitted the fraudulent applications which contained false information to the insurance companies. PSR ¶¶ 32 and 34. Leo Fekete recruited one elderly insured into the scheme and facilitated the filing of a fraudulent application which contained inflated net worth and income. Fekete's wife, a licensed New York State insurance agent affiliated with Liberty Planning, received a commission on this policy. PSR ¶ 39.

It was also part of the scheme that the conspirators engaged in financial transactions designed to falsely convince the insurance companies that the straw insureds were paying the premiums on the policies, when in fact the policies were funded by third party investors, including the defendant. PSR ¶¶ 14, 32 and 34. In order to conceal the source of the funds deposited into the insureds' trust accounts, the conspirators caused money to be exchanged among and between themselves, Liberty Planning, the Lebovits Related Companies and companies affiliated with the Neumans. PSR ¶ 14. The premium payments were either paid directly into individual trust bank accounts set up in the insured's names, or funneled through different accounts before being paid to the individual trust accounts, which in turn, paid the insurance companies. Specifically, the defendant invested $1.9 million into two insurance policies issued to elderly insured Arnold Cohen. The defendant deposited money for the premium payments directly into Cohen's individual trust account, and the trust account was used to pay the insurance company directly. Id.

2

After the insurance companies issued the policies to the insureds, the conspirators created false records and made false statements indicating that the elderly insureds had poorer health than they actually had. PSR ¶ 15.  This was done to cause the projected life expectancies of the insured to be lowered, which would, as a result, fraudulently inflate the resale prices that prospective purchases would be willing to pay for the straw buyer's life insurance policies on the secondary life insurance market. Id. To that end, the elderly insureds were directed by the conspirators to visit doctors and lie about health problems.

The conspirators stood to profit from the scheme through: 1) the death benefits they would collect if the insureds died before the periods of contestability expired; 2) the commission that Liberty Planning, other general insurance agencies, Gutwein and other other insurance agents who participated in the scheme would receive from the premiums paid; and 3) the profits that the conspirators could make by reselling the policies on the secondary market once the periods of contestability expired. PSR ¶ 16.  While the defendant intended to realize a profit on the fraudulent insurance policies, the defendant most likely lost more money than he gained on his investment in the Cohen policies. PSR ¶ 30.

In or about 2009, after an investigation by ING uncovered numerous fraudulent applications submitted through Liberty Planning, ING filed civil actions seeking to rescind life insurance policies submitted by Liberty Planning.  In addition, other insurance companies that did business with Liberty Planning terminated their contracts with Gutwein and other agents affiliated with Liberty Planning after learning of the fraudulent insurance applications.  Following an investigation led by the U.S. Postal Inspection Service, on or about February 23, 2011, agents arrested the defendant, Gutwein, Fekete, Grodsky and the Neumans.

On September 8, 2014, the defendant pleaded guilty to Count One of a superseding indictment charging him with conspiring to defraud insurance companies, via mail and wire fraud, in violation of 18 U.S.C. § 1349.  In the plea agreement, the government agreed to recommend a sentence of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B).

## II.     Defendant's Guidelines Calculations

The Department of Probation's Presentence Investigation Report calculates the defendant's United States Sentencing Guidelines range to be 41 to 51 months based on a total offense level of 22 and a Criminal History Category of I.  PSR ¶¶ 58, 90.  The PSR provides enhancements for loss amount and a two-point enhancement for the defendant's role in the offense not contemplated in the parties' plea agreement.   The government respectfully argues that, in accordance with the plea agreement entered into by the parties, the Court should find the applicable Guidelines range to be 12 to 18 months, based on a total offense level of 13 and a Criminal History Category of I.

## A. Loss Amount

The PSR includes a 16-level enhancement corresponding to a loss amount of more than $1,000,000 but less than $2,500,000. PSR ¶ 49. The PSR's calculation of loss is based on commission payments in excess of $1,000,000 obtained by Liberty Planning and Avigdor Gutwein over the course of the conspiracy. Id. However, the government has no evidence of the defendant's personal involvement in the conspiracy other than his investment in two insurance policies, nor is it clear from the government's evidence that the total amount of the commission payments obtained during the course of the entire conspiracy were foreseeable to the defendant.

Further, consistent with the government's position as to the loss amount attributable to the other co-defendants in this case, the government believes that a more accurate assessment of the loss amount corresponds to the lapse rate assessed by the insurance companies. Insurance companies issue and price policies based on a calculated lapse rate. A lapse rate is the rate at which insured individuals allow their policies to expire because the amount of premiums they have already paid has exceeded or soon will exceed the amount they can collect should the death of the insured occur. Here, because the premiums were actually being paid by third-parties investors who counted on the pay-out of the policy as a return on their investment, they had no intention of letting the policies lapse. As a result, the insurance companies' lapse rate was based on falsely-provided information which caused them to charge lower premiums than they otherwise would have with respect to the policies at issue. However, attempting to determine what the correct premiums should have been and over what period of time the proper premiums would have been paid to the insurance companies are difficult endeavors.

As a result, based on the evidence available to the parties at the time of the defendant's guilty plea, and in accordance with U.S.S.G. § 2B1.1, App. Note (3)(c), a reasonable estimate of the loss suffered by the insurance companies that is attributable to the defendant was more than $70,000 but less than $120,000 and a corresponding 8-point enhancement is appropriate. U.S.S.G. § 2B1.1(b)(1)(E).

## B. Abuse of Position of Trust

The PSR also includes a two-point enhancement for abuse of trust since the defendant was a licensed insurance agent, per Guideline 3B1.3. The government has no evidence that the defendant personally submitted any insurance applications to the insurance companies. In addition, the government agrees with defense counsel's contention that although the policies were submitted by Liberty Planning, of which the defendant is a principal, the insurance companies conducted independent verification of the policies prior to authorization. Accordingly, the government stands by the Guidelines calculation set forth in the plea agreement entered into by the parties.

### III. Conclusion

For the reasons set forth above, the government respectfully recommends a sentence of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B), and restitution pursuant to 18 U.S.C. § 3663A, be ordered in this case, as it would be sufficient but not be greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:   /s/ *Tanisha Payne*
Tanisha R. Payne
Peter Baldwin
Assistant U.S. Attorneys
(718) 254-6358/6236


cc:   Clerk of the Court (SJ (by ECF)
Nathaniel Z. Marmur, Esq. (by ECF and Email)
USPO Michelle Espinoza, U.S. Department of Probation